

The following constitutes
the order of the court. Signed March 26, 2014

Charles Novack
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>JEFFREY L. FRIMMERSDORF AND KELLY H. FRIMMERSDORF,<br><br>Debtors. | Case No. 11-57442 CN<br><br>Chapter 11 |
| CHRIS SULLIVAN,<br><br>Plaintiff,<br><br>vs.<br><br>JEFFREY L. FRIMMERSDORF AND KELLY H. FRIMMERSDORF,<br><br>Defendants. | Adversary No. 11-5278<br><br>**MEMORANDUM ORDER** |

    On October 28 and 29, 2013, this court conducted a trial in the above adversary proceeding. All appearances were made on the record. The following memorandum constitutes this court's findings of fact and conclusions of law.

    In April 2007, Yakov Temov, Jeff Frimmersdorf and Brian Santor formed Accrete Holdings, LLC ("Accrete LLC") as equal, one-third interest holders. The three parties created Accrete LLC to exploit certain technology known as "CallBoom," and each contributed their own specialized knowledge to this endeavor. Temov, a software engineer by trade, held the patent rights to the CallBoom technology. This technology ultimately was transferred to an entity known as

"Voice4Biz," which became a wholly owned subsidiary of Accrete LLC.[1] Frimmersdorf and Santor were former Ebay employees with extensive experience in online marketing and sales related to the automobile industry. Together, Temov, Frimmersdorf and Santor formed Accrete LLC to exploit CallBoom's commercial potential.

Accrete LLC, however, badly needed working capital. In late 2007, Accrete LLC associated with plaintiff Chris Sullivan, a Las Vegas, Nevada real estate attorney and investor, as part of its search for equity investors and clients.[2] As a result of this association. Accrete LLC moved its business operations from Northern California to Las Vegas, Nevada in 2008, and thereafter created a new entity: Accrete Holdings, Inc. d/b/a Mobile Nation Network ("MNN").[3] MNN assumed ownership of all of Accrete LLC's property and interests, including the CallBoom IP.[4] Sullivan, Temov, Frimmersdorf and Santor all became MNN directors and shareholders, with Sullivan holding a 12.5% ownership stake in the company (Sullivan also became an officer of MNN). Sullivan also became MNN's landlord after the company located its headquarters at 332 South Jones Boulevard in Las Vegas (the "Property"), a building owned by Sullivan. Sullivan's law practice and real estate office were also located on the Property.

Sullivan's primary role was to use his business contacts to help MNN secure clients who would license the CallBoom IP or contract with MNN to design online marketing applications and campaigns based on the CallBoom IP. Through his efforts, MNN pitched its services to a variety of businesses, including Allegiant Airlines, Las Vegas Dissemination Company, Harrah's, and the Las Vegas Valley Water District. These meetings rarely resulted in any real, paying business.

---

[1] Temov was the only witness who described how Accrete LLC acquired Voice4Biz, and indirectly, the CallBoom IP. Temov did not recall how Accrete LLC acquired its interest in Voice4Biz.

[2] Frimmersdorf and Sullivan initially met several years earlier through a mutual friend.

[3] Sean Flanagan, a Nevada corporate attorney and colleague of Sullivan, assisted in the formation of MNN. MNN was a Nevada corporation.

[4] No one testified how or why MNN assumed ownership of Accrete LLC's interests and assets.

### The CallBoom IP Business Plan

The CallBoom technology involved software[5] embedded in an online digital medium such as a web-page, ebook, or webinar, which created a variety of online/digital marketing opportunities. The software would appear to an end-user in the form of a "widget," "button," or "toolbar" which would prompt the user to enter his phone number and click the "button." The end-user would then receive a phone call that could, depending on the circumstances, consist of a pre-recorded message, connect the user to a live individual, or route the user into a voicemail system where they could leave a message that a sales agent or service provider would return. The phone call also could trigger a variety of marketing or advertising devices. For example, the web page containing the "button" could display advertisements and other media coordinated with the phone call, or the phone call's ring tone itself could be tailored for the client's specific marketing purposes. MNN developed a slew of plans by which it could monetize the CallBoom IP, including licensing the software, developing customized applications, receiving a fixed fee for every "button" click or, if the software became a widely adopted marketing platform, by selling advertising that would be displayed within the "buttons."

### The Penton Media Transaction

In May 2008, MNN signed a marketing agreement with Penton Media ("Penton"), a media company that published various business-to-business trade publications (both print and digital) and ebooks. Penton also owned and operated various trade-shows. Penton was interested in using the CallBoom IP in its digital publications and products. The marketing agreement contemplated that MNN would be paid each time a user clicked a CallBoom button (the "Penton Transaction"). To accommodate the anticipated increase in digital traffic that the Penton Transaction would generate, MNN needed additional capital to, among other things, obtain additional servers, purchase large blocks of prepaid "minutes" to handle the phone calls that MNN would need to make when a Penton user clicked on a CallBoom button, and hire additional support staff. By this time, Frimmersdorf,

---

[5] Any references to the CallBoom IP or technology in this memorandum order shall include the actual patent application, the software written to implement the concepts contained in the patent application, and any related code on which the software was based.

Temov and Santor were spending substantially all of their working hours on MNN without remuneration, and their personal funds were almost exhausted.

In late June 2008, Frimmersdorf and Temov traveled to Penton's Cleveland, Ohio headquarters to ensure that the CallBoom IP was fully compatible with Penton's software and digital publications. MNN badly needed cash not only to support the anticipated work that the Penton Transaction would generate, but also to continue MNN's basic operations. Sullivan initially directed MNN to a potential investor: John Gaughan, who was interested in investing $250,000 in exchange for a 17.5% stake in MNN. The Gaughan investment never came to fruition, and in early July 2008, Sullivan loaned $250,000 to MNN (the "MNN Loan").

**The MNN Loan**

Sullivan funded the MNN Loan by taking out a 12% hard money loan against the Property (the "Property Loan"). The Property Loan required Sullivan to make monthly, interest-only payments, with a balloon payment due in two years. Sullivan tied the MNN Loan closely to his Property Loan. While the parties all acknowledge that the loan amount was $250,000, MNN only received approximately $183,000 in cash. This amount reflected Sullivan's decision to 1) withhold, among other amounts, $30,000 to cover his interest only payments on the Property Loan, and 2) charge an $18,000 origination fee.

Despite his years of experience as a real estate attorney and investor, Sullivan did not draft and require MNN to sign a promissory note. The MNN Loan terms are instead found in a July 5, 2008 email, which described the loan terms as follows[6]

1. The principal loan amount was $250,000.
2. A year's worth of interest would be retained by Sullivan, and MNN would repay the loan as soon as it received additional funding.
3. If MNN could not pay the $250,000 principal loan amount, the CallBoom IP would be sold, licensed, or otherwise liquidated to pay the MNN Loan.[7]

---

[6] The court refers the parties to Plaintiff's Exhibit 3, an email from Sean Flanagan to Sullivan and Frimmersdorf.

[7] Although Sullivan alleges that the MNN Loan was guaranteed by Frimmersdorf and secured by the CallBoom IP as well as any servers purchased with its proceeds, he did not introduce into evidence any guarantee or security agreement.

4

Sullivan contends that Frimmersdorf represented to him that MNN would use the bulk of the MNN Loan proceeds to acquire the "bandwidth" necessary to "ramp-up" for the pending Penton Transaction. Setting aside the question of what the parties actually meant by the term "bandwidth" (which is discussed in greater detail below), the parties do not dispute how MNN actually spent the proceeds it actually received. MNN paid (1) approximately $135,000 in salary to Frimmersdorf, Temov, and Santor (at a rate of $15,000 per person per month); (2) $10,000 in legal fees to Flanagan; (3) $15,000 to Titan Capital, which MNN retained to locate equity investors; (4) approximately $2000 for additional servers, and the remaining proceeds on travel expenses, monthly internet connection fees, and various other administrative expenses.

Frimmersdorf denies that he told Sullivan that the MNN Loan would be used exclusively to purchase servers or "bandwidth." He testified that Sullivan was well aware that Temov, Santor and him needed to start paying themselves a salary in order to remain committed to MNN. Frimmersdorf and Temov also testified that they only expected to use a portion of the loan proceeds to purchase additional servers and bulk "minutes" for the Penton Transaction. Temov and Frimmersdorf stated that the "bulk minutes" would have cost a minimum of $10,000 per month and would have required MNN to sign a long-term contract.

Frimmersdorf, Sullivan and their MNN compatriots communicated extensively by email, and these emails generally support Frimmersdorf's testimony. First, Plaintiff's Exhibit "3," the July 5, 2008 email which comes the closest to memorializing the MNN Loan, does not state how MNN intended to spend the loan proceeds. It does, however, state that MNN was "unable to sustain itself" and that it needed the cash to pay "for the company's operations," which a reasonable party could infer includes the payment of salaries of its key employees. In an earlier email, dated May 14, 2008, from Sean Flanagan to Sullivan, Santor, and Frimmersdorf, Flanagan discusses the pressing need to raise funds to proceed with the Penton Transaction, stating that MNN needed "immediate capital to acquire bandwidth and support, *as well as providing for Jeff, Brian, and Yakov*." (emphasis added).

Other corporate documentation introduced into evidence further undermine Sullivan's allegations of fraud. For example, the company's internal budgeting documents and its private

5

placement memoranda confirmed MNN's intention to pay Frimmersdorf, Temov, and Santor's salaries from any equity infusion (the proposed salaries in the private placement memoranda were actually closer to $20,000/month). Moreover, both Sullivan and Temov testified that they discussed with Sullivan their need to pay themselves substantial salaries before he made the MNN Loan.[8]

Unfortunately for MNN, Penton Media closed its division that most needed the CallBoom IP only a few months after executing the Penton Transaction. This corporate downsizing effectively killed the Penton Transaction. While MNN did not cease operations following the collapse of the Penton Transaction and continued to solicit investors, potential clients and licensing opportunities through early 2010, the loss of the Penton Transaction unerringly lead to its demise.[9]

While MNN was current with its interest-only loan payments due to the $30,000 "escrow" established by Sullivan, it made only five more interest-only payments and then fully defaulted on the unpaid loan balance in November 2009. Sullivan thereafter sued MNN and Frimmersdorf in Nevada state court, alleging, among other things, that Frimmersdorf had personally guaranteed the MNN Loan. Frimmersdorf's Chapter 7 bankruptcy petition stayed this litigation.

## LEGAL DISCUSSION

**The §523(a)(2)(A) Claim**

Sullivan first contends that Frimmersdorf defrauded him when he made the MNN Loan, and he asserts that this debt is non-dischargeable under Bankruptcy Code § 523(a)(2)(A). Bankruptcy Code § 523(a)(2)(A) provides that "A discharge . . . does not discharge an individual debtor from any debt . . . (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by - (A) false pretenses, a false representation, or actual fraud[.]" A creditor

---

[8] Sullivan testified at trial that the Operating Agreement for "Accrete Holdings, LLC, a Delaware Limited Liability Company", drafted sometime in 2007, limited Frimmerdorf, Santor and Temov's salary to $2000/month. This evidence is of little value, since the Operating Agreement introduced into evidence was not signed, it involved MNN's predecessor in interest (in which Sullivan had no interest) and thus did not apply to MNN's operations, and Sullivan did not become aware of it until after he made the MNN Loan.

[9] For example, in November 2008, MNN and On24 signed a licensing agreement to allow On24 to use the CallBoom IP in its webinars, virtual trade shows, and multimedia products. Unfortunately, this relationship did not yield significant revenues.

6

must establish five elements by a preponderance of the evidence to prevail on a § 523(a)(2)(A) claim: (1) misrepresentation, fraudulent omission or deceptive conduct by the debtor; (2) knowledge of the falsity or deceptiveness of the statement or conduct; (3) an intent to deceive; (4) justifiable reliance by the creditor on the debtor's statement or conduct; and (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct. *Turtle Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman),* 234 F.3d 1081, 1085 (9th Cir. 2000). A §523(a)(2)(A) claim may also arise from the concealment or intentional non-disclosure of material facts. *In re Evans*, 181 B.R. 508, 515 n.6 (Bankr.S.D. Cal.1995). A debtor's knowledge and intent to deceive may be inferred by circumstantial evidence and from the debtor's conduct. *Edelson v. CIR*, 829 F.2d 828, 832 (9th Cir. 1987); *Donaldson v. Hayes (In re Ortenzo Hayes)*, 315 B.R. 579, 587 (Bankr. C.D. Cal. 2004). A §523(a)(2)(A) claim requires that the "target misrepresentation must have existed at the inception of the debt, and a creditor must prove that he or she relied on that misrepresentation." *Reingold v. Shaffer (In re Reingold)*, 2013 WL 1136546, at *5 (9th Cir. BAP Mar 19, 2013); *see also, New Falls Corp. v. Boyajian (In re Boyajian),* 367 B.R. 138, 147 (9th Cir. BAP 2007) (*citing Bombardier Capital, Inc. v. Dobek (In re Dobek)*, 278 B.R. 496, 508 (Bankr. N.D. Ill.2002)).

Sullivan asserts that Frimmersdorf made four material misrepresentations which induced him to make the MNN Loan. Sullivan contends that:

(1) Frimmersdorf represented to him that the MNN Loan was needed primarily to pay for servers to increase MNN's "bandwidth" for the Penton Transaction, and never informed him that the loan proceeds would be used to pay Frimmersdorf, Temov, and Santor's salaries;

(2) Frimmersdorf represented that MNN owned the CallBoom IP when, in fact, the CallBoom IP was never transferred to MNN;

(3) Frimmersdorf never intended to use the MNN Loan for the benefit of MNN, but he intended to pay himself a salary and to ultimately use the CallBoom IP in a manner that would benefit himself and other businesses unrelated to MNN; and

(4) Frimmersdorf represented that the CallBoom IP was functional software, which it was not.

7

Sullivan has not established his fraud claims by a preponderance of the evidence. First, as discussed above, there is a substantial dispute regarding what representations were made regarding MNN's use of the loan proceeds. The relevant emails and other corporate documents indicate that MNN intended to use any loan proceeds or equity infusion to pay operational costs as "well as providing for Jeff, Brian and Yakov." Such language can reasonably include salary payments to Frimmersdorf, Temov and Sandor, who were the creative (and thus critical) brains of the outfit. This court found Frimmersdorf to be a credible witness on this issue. Moreover, the corporate documents which MNN prepared for prospective equity investors stated that MNN would use the funds in part to pay substantial monthly salaries to its founders.

While all parties agree that some of the MNN Loan proceeds were needed to increase the company's "bandwith," the parties disagree on the scope of this term. Sullivan testified that increasing "bandwith" meant purchasing the additional hardware (such as servers) to accommodate the Penton Transaction. Frimmersdorf and Temov testified at trial, however, that "bandwith" included not only more hardware but also the bulk minutes needed to handle the Penton Transaction phone calls, and hiring (and paying) additional support and technical staff. While a literal definition of the term seemingly does not include staff salary,[10] this issue is irrelevant because MNN's use of the loan proceeds is consistent with the emails and corporate documents cited above. Simply, Sullivan has not persuaded this court that Frimmersdorf intentionally misrepresented, deceived or failed to disclose how MNN intended to use the funds. Again, Sean Flanagan's July 5th email states that the loan was necessary to maintain MNN's operations, which this court reasonably interprets to mean paying salaries and establishing the necessary infrastructure to proceed with the Penton Transaction. Even Sullivan conceded at trial that some portion of the funds would be used by MNN to pay Frimmersdorf a salary so that he could "pay his bills and put food on the table." Moreover, no one testified that the funds spent on the salaries would have jeopardized MNN's ability to meet its

---

[10] The relevant dictionary definition of bandwidth describes it as the "amount of data that can be passed along a communications channel in a given period of time."American Heritage Dictionary of the English Language, 5th Ed. p.140. In this instance, Sullivan has not demonstrated by a preponderance of the evidence that this is the applicable definition.

**MEMORANDUM ORDER**

Penton Transaction obligations.

Sullivan also unsuccessfully alleges that the CallBoom IP was never transferred to MNN. Temov was the only witness who testified on this issue. He stated that Accrete LLC, which held an interest in the CallBoom IP via its wholly owned subsidiary, Voice4Biz, transferred its interest to MNN. Sullivan did not provide any evidence which seriously countered Temov's testimony.

Finally, Sullivan's allegations that Frimmersdorf never intended to use the MNN Loan for the MNN's benefit, and instead planned to use the funds to finance other corporate ventures that would use the CallBoom IP, are equally fruitless. Sullivan did not introduce any evidence demonstrating that the MNN Loan proceeds were invested in or used by any other entity, or used to form any other business. While Sullivan established that Frimmersdorf did consult with other companies that needed his online marketing expertise, he has not cogently argued or explained how this misled him into making the MNN Loan. Nor did Sullivan present any evidence that Frimmersdorf individually or indirectly through MNN licensed or sold the CallBoom IP without Sullivan's knowledge. Temov and Frimmersdorf both testified that they gave Sullivan the source code for the software MNN had developed, a fact which Sullivan did not dispute. Moreover, Frimmersdorf presented evidence that he diligently attempted to license and/or sell the CallBoom IP to generate funds for MNN. Finally, Sullivan did not offer any testimony, expert or otherwise (other than his own, non-expert, self-serving testimony) that the CallBoom IP was defective or commercially not viable. The testimony established that the CallBoom IP functioned as intended, and that MNN's collapse was caused by a confluence of factors that have led to the deathknell of many a start-up: the Great Recession, rapid shifts in technology, and plain bad luck. Accordingly, Sullivan's §523(a)(2)(A) claims are denied.

**The 523(a)(4) Defalcation Claim**

Sullivan next claims that Frimmersdorf was acting in a fiduciary capacity, and that he committed fraud or defalcation while in that role. Debts that arise due to "fraud or defalcation" when a debtor is acting in a "fiduciary capacity" are non-dischargeable under §523(a)(4) of the Bankruptcy Code. Whether a person is a fiduciary under § 523(a)(4) is a question of federal law." *Lewis v. Scott (In re Lewis)*, 97 F.3d 1182, 1185 (9th Cir.1996) (citing *Ragsdale v. Haller (In re Haller)*, 780 F.2d 794, 795 (9th Cir.1986)). Sullivan has not established this claim by a

9

preponderance of the evidence. Sullivan offered no evidence that a fiduciary relationship existed between the parties. Both parties were minority interest holders and directors of MNN, a Nevada corporation. Sullivan has not referred this court to any Nevada state law or statute that could support a finding of a § 523(a)(4) fiduciary relationship, and Ninth Circuit law generally indicates otherwise. See *In re Cantrell*, 329 F.3d 1119 (9th Cir. 2003). Moreover, even if a fiduciary relationship existed, this court has determined that Frimmersdorf did not defraud Sullivan, and there is no evidence that he committed a defalcation. A defalcation requires gross recklessness, if not criminal behavior, and not such conduct is present. See *Bullock v. BankChampaigne, N.A.*, 133 S.Ct. 526 (2013). Accordingly, this claim is also denied.

**The 523(a)(6) Claim**

Sullivan lastly asserts a non-dischargeable claim under Bankruptcy Code § 523(a)(6). Section 523(a)(6) provides, in pertinent part, that an individual debtor cannot discharge a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."

The "willful" and "malicious" prongs of § 523(a)(6) are analyzed separately. *In re Sicroff*, 401 F.3d 1101,1105 (9th Cir. 2005). The Ninth Circuit has held that an injury is 'willful' "when the debtor has a subjective motive to inflict [such] injury" or when the debtor believes that injury is "substantially certain to result from his own conduct." *Carrillo v. Su (In re Su)*, 290 F.3d 1140, 1142 (9th Cir. 2002). A bankruptcy court may consider circumstantial evidence to establish what the debtor must have known at the time of the conduct in question, rather than simply relying on what a debtor admits he knew. *In re Su*, at 1146, n. 6.

A "malicious injury involves (1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse." *Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202, 1209 (9th Cir. 2001). Malice may be inferred based on the nature of the wrongful act. *In re Ornsby*, 591 F.3d 1199, 1207 (9th Cir. 2010).

Sullivan's § 523(a)(6) theories mimic his unsubstantiated claims under § 523(a)(2), and they fail for the same reason. Simply, there is no evidence that Frimmersdorf intended to harm Sullivan or that he knew that his conduct was substantially certain to harm Sullivan. Instead, Frimmersdorf took reasonable steps to make MNN a viable business. Furthermore, Sullivan did not establish that

10

Frimmersdorf committed any wrongful act that injured Sullivan. Accordingly, Sullivan's § 523(a)(6) claim for relief is denied.

Having found in his favor, Frimmersdorf shall submit an appropriate judgment denying all claims for relief.

* * END OF ORDER * * *

**COURT SERVICE LIST**

Jeffrey L. Frimmersdorf
17550 Old Summit Road
Los Gatos, CA 95033

Kelly H. Frimmersdorf
17550 Old Summit Road
Los gatos, CA 95033

Yakov Temov
220 Oak Ridge Rd
Los Gatos, CA 95033

Chris Sullivan
332 S. Jones Blvd
Las Vegas, NV 89107